# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>INTEGRATED PROTEINS LLC<br><br>             DEBTOR. | Case No. 26-20713-11-DLS<br>**LEAD CASE**<br>*Jointly Administered with cases below* |
| IN RE:<br>NUTRIHUB LLC<br>             DEBTOR. | Case No. 26-20714-11 |
| IN RE:<br>HFO LOGISTICS LLC<br>             DEBTOR. | Case No. 26-20715-11 |

## MOTION TO PROVIDE ADEQUATE PROTECTION TO AMERICAN RIVER AG, INC.

COME NOW Debtors Integrated Proteins LLC ("IP"), NutriHub LLC ("Nutrihub"), and HFO Logistics LLC ("HFO") (collectively "Debtors"), by and through their counsel David Prelle Eron of Prelle Eron & Bailey, P.A. and Robert J. Haupt of Haupt Law PC, and hereby request that the Court enter an Order allowing the Debtors to provide adequate protection to American River Ag, Inc. ("ARA") pursuant to 11 U.S.C. § 361. In support thereof, the Debtors state as follows:

1. On May 6, 2026 ("Petition Date"), the Debtors filed their Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code. An unsecured creditors committee was appointed on May 26, 2026. No chapter 11 trustee has been appointed herein. Debtors are debtors-in-possession.

2. The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. 1334, its local rules, and 11 U.S.C. §§ 361-63.

3. Before the Petition Date, IP conducted business for several years with ARA. ARA provides warehousing, processing, transloading and related services for inventory purchases by IP.

1

ARA also sells livestock feed and pet food ingredients to IP.  A true and correct copy of the most recent Transloading and Warehousing Agreement is attached hereto as Exhibit 1 ("Agreement").  Pursuant to Paragraph 6 of the Agreement, on the Petition Date ARA held a lien upon all goods in the possession of ARA that were owned by IP, such lien being perfected by possession.  This Motion does not seek any determination concerning the nature, extent, validity, or priority of this lien.

4.      On the Petition Date, ARA was holding approximately $6,523,278.20 of inventory owned by IP ("ARA Inventory").  IP required and continues to require delivery of the inventory stored by ARA in order to continue producing and selling products from and after the Petition Date.

5.      On the Petition Date, ARA held a claim against IP of approximately $1,483,118.79 (the "Pre-Petition Claim").  The Pre-Petition Claim is secured by the ARA Inventory.  Continued access to the ARA Inventory and the goods and services provided by ARA are critical to the success of the Debtors and their chapter 11 estates.  ARA will only a) continue providing goods and services post-petition, and b) release the ARA Inventory if IP agrees to provide adequate protection.

6.      IP entered into a post-petition transactional Memorandum of Understanding (the "MOU") on June 8, 2026 with ARA.  Said MOU acknowledges ARA's security interest in and to the ARA Inventory located at ARA's Stockton, California Warehouse.  According to the terms of the MOU, as adequate protection, Debtors propose to provide ARA with the following:

   a. a replacement lien on inventory acquired post-petition and stored at ARA's facility, in all respects equal to the nature, extent, validity, and priority as existed on the Petition Date;

2

b. an obligation by IP to maintain the ARA Inventory held by ARA at a value of not less than one hundred twenty per cent (120%) of the Pre-Petition Claim;

c. a reservation of ARA's right to assert an administrative claim under Section 503(b) for any diminution in the value of ARA's lien on the ARA Inventory from and after the Petition Date, to the extent that such diminution impairs the secured amount of the Pre-Petition Claim;

d. payment of post-petition charges on a "net 15" basis; and,

e. a weekly payment of $17,500.00 (the "Pre-Petition Payment"), which shall be applied solely to reduce the unpaid balance of the Pre-Petition Claim, together with post-petition interest at the rate of 10% per annum, costs, expenses, and reasonable attorneys' fees. The weekly Pre-Petition Payment is in addition to, and shall not reduce, replace, defer, or impair Debtors' obligation to pay all post-petition invoices due to ARA.

The foregoing is only a summary of the terms of the MOU. A true and correct copy of the MOU is attached hereto as "Exhibit 2".

7. Debtors state that the proposed terms are not unduly burdensome on Debtors and will not prejudice the rights of unsecured creditors.

8. Debtors request that any Order granting this Motion be without prejudice to Debtors, ARA, or any other party subsequently filing a motion to modify the adequate protection provided to ARA, but any subsequent modification shall not have any effect on the adequate protection previously provided.

WHEREFORE, Debtors pray for entry of an Order authorizing the approval of adequate protection to ARA as listed above in the manner indicated pursuant to 11 U.S.C. § 361, approving

3

all of the terms and conditions of the MOU, and for such other and further relief as the Court deems

just and equitable.


**Respectfully Submitted by:**

PRELLE ERON & BAILEY, P.A.                    HAUPT LAW PC
*Attorneys for Debtors*                       *Attorneys for Debtors*

*/s/ David Prelle Eron*                        */s/ Robert J. Haupt*
David Prelle Eron, #23429                     ROBERT J. HAUPT, #28216
January M. Bailey, #23926                     9393 W 110th Street, Suite 500
301 N. Main St., Suite 2000                   Overland Park, KS 66210
Wichita, KS 67202                             913-498-9390 / 405-706-9292
316-262-5500 / 316-262-5559 (fax)             rhaupt@hauptlaw.com
david@eronlaw.net
january@eronlaw.net


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2026 a true and correct copy of the foregoing was electronically filed with the Court using the CM/ECF system, which sent notification to the Office of the U.S. Trustee and to all parties of interest participating in the CM/ECF system.

Furthermore, I certify that true and correct copies of the same were forwarded via U.S. Mail, First Class, postage prepaid and properly addressed to the following:

    See Attached Matrix.

                    */s/ Margaret R. Spangler*
                    MARGARET R. SPANGLER
                    Assistant to David Prelle Eron

4

EXHIBIT 1

# American River Ag, Inc.
# Transloading and Warehousing Agreement

This Transloading and Warehousing Agreement (this "Agreement"), dated as of February 1, 2026 (the "Effective Date"), is entered into by and between **American River Ag, Inc.**, a California corporation ("Company"), and **Integrated Proteins, LLC**, a Wyoming limited liability company ("Customer", and together with Company, the "Parties", and each, a "Party").

## Recitals

WHEREAS, Company is in the business of (i) providing warehousing, processing, transloading and related services (the "Company's General Services") including but not limited to the Services (as defined below) and (ii) selling livestock feed and pet food ingredients (the "Products");

WHEREAS, Customer is a customer of Company who from time to time purchases and receives (i) certain of Company's General Services and (ii) the Products pursuant to sales orders entered into by and between the Parties from time to time (such sales orders, whether dated on, prior to or after the Effective Date are referred to herein as the "Sales Orders");

WHEREAS, Customer desires to engage Company to provide the Services, and Company is willing to provide the Services to Customer, subject to the terms of this Agreement; and

WHEREAS, the Parties intend the terms of this Agreement to supersede all previous agreements entered into by and between the Parties relating to any of Company's General Services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## Agreement

1.      Provision of Warehousing and Related Services. Company agrees to provide warehousing, storage, transloading, handling and related additional services (the "Services") identified on the Warehouse Fee Schedule attached hereto as Exhibit A (the "Fee Schedule") with respect to the goods identified on the applicable Transportation Contract (as defined below) (the "Goods") which are tendered for storage by Customer from time to time pursuant to this Agreement. Company shall provide the Services at its facility located at 510 Gilmore, Port Stockton, CA 95203 or such other location as Company shall identify in a written notice to Customer (the "Warehouse").

2.      Tender of Goods for Storage.

        A.      Customer represents and warrants that it is the owner or has lawful possession of the Goods, has all right and authority to store the Goods with Company and, thereafter, direct the release and/or delivery of the Goods, and that the Goods are not, nor do they contain, hazardous or dangerous materials. Customer shall (i) tender any Goods for storage only during Company's posted business hours for the Warehouse; (ii) tender all Goods to the Warehouse properly marked and packed for storage and handling; (iii) display all allergen information related to the Goods, if any, on the principal display panel of the outermost packaging of the Goods; (iv) provide Company with written information concerning the Goods that is accurate, complete, and sufficient to allow Company to comply with all laws and regulations concerning the storage, handling, processing, and transportation of the Goods; and (v) furnish at or prior to tender of the Goods for storage a manifest in a form approved by Company listing any categories of Goods, brands or sizes to be separately kept and accounted for. If there is any conflict between the contents of such manifest and the terms of this Agreement, the terms of this Agreement shall prevail.

        B.      Company may refuse to accept any Goods for storage if the Goods do not conform to Customer's description contained on the applicable Transportation Contract. For all Goods shipped to the Warehouse, Customer shall ensure that the bill of lading or other contract of carriage ("Transportation Contract") as well as all declarations to government

regulatory agencies (i) identify Customer as the named consignee, in care of Company, and (ii) do not identify Company as the consignee. If any Goods are shipped to the Warehouse naming Company as named consignee on the Transportation Contract, Customer shall promptly notify the carrier in writing that Company is (i) the "in care of party" only and (ii) does not have any beneficial title or interest in the Goods. Company may refuse to accept any Goods tendered for storage in violation of this provision, and shall not be liable for any loss or damage to, or misconsignment of, such Goods. Whether Company accepts or refuses goods shipped in violation of this Section 2, Customer agrees to indemnify and hold Company harmless from all claims for transportation, storage, handling, and other charges relating to such goods, including surcharges, undercharges, rail demurrage, truck/intermodal detention, and other charges of any nature whatsoever. Customer further agrees to indemnify, defend, and hold Company harmless from any costs, liabilities, actions, penalties, or expenses of any kind associated with the improper declaration of Company as consignee.

3.      Indemnity. In addition to its indemnification obligations pursuant to Section 2 above, Customer shall indemnify, defend, and hold harmless Company and its officers, directors, shareholders, employees, agents, affiliates, successors, and permitted assigns (collectively, "Indemnified Party") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind incurred by Indemnified Party as a result of or related to any third-party claim with respect to, based on, or arising out of the Services or Customer's negligence, willful misconduct, or breach of this Agreement (each a "Warehouse Claim"). Customer shall not enter into any settlement of a Warehouse Claim without Company's prior written consent.

4.      Access and Release of Goods. Customer shall provide Company forty-eight (48) hours' advance written notice and instructions (each, a "Release Order") if it desires Company to release any Goods from the Warehouse. Subject to (i) receipt of such Release Order, (ii) payment of all outstanding storage and other fees and (iii) Company, in its sole discretion, deeming the instructions in the applicable Release Order to be commercially reasonable, Company shall release the requested Goods to Customer.

5.      Transfer of Goods; Pallets. Company may, without notice, (a) move any or all of the Goods from one location within the Warehouse in which the Goods are stored to another location within the Warehouse and (b) with respect to any goods that have been stored on a pallet, breakdown the pallet in order to store the Goods on multiple pallets or in any other manner deemed advisable by Company.

6.      Warehouse Lien. Company shall have a lien on the Goods tendered by Customer, and upon any and all property belonging to Customer in Company's possession, custody or control, for all fees, charges and expenses due (i) in connection with the Services or any of the Products purchased by Customer or (ii) pursuant to any provision of this Agreement or pursuant to any provision of the Sales Orders (collectively, the "Obligations"). Company shall have a lien on the Goods and such other property, and may refuse to surrender possession of the Goods and such other property in an amount equal to any outstanding and past due charge or debt until all charges or debts are paid in full. If such charges or debts remain unpaid for thirty (30) days past the payment due date, then Company may sell the Goods and such other property at public auction or private sale to secure Customer's payment of all the Obligations, as well as for like charges and expenses in relation to any other goods whenever deposited with Company by Customer. Company may enforce this lien at any time, including by selling all or any part of the Goods and such other property in accordance with applicable law.

7.      Storage and Handling Charges.

A.      Customer shall pay the charges for the Services at the rates set forth in the column titled "Tier 1" on the Fee Schedule, which column, for the avoidance of doubt, has been highlighted in yellow on the Fee Schedule. All charges for storage are based upon the applicable unit specified on the Fee Schedule, per year. Company may, upon thirty (30) days written notice, revise its rates, including during the time the Goods are in storage. The current Fee Schedule shall be provided at the time of deposit of Goods into storage and upon request by Customer. The Goods are deemed to be received on the date that Company receives the Goods, regardless of the unloading date or the date the warehouse receipt for the Goods is issued. Notwithstanding the above, (i) a full month's storage charge will apply to all Goods received between the first and the 15th,

inclusive, of a calendar month; (ii) one-half month's storage charge will apply to all Goods received between the 16th and last day, inclusive, of a calendar month; and (iii) a full month's storage charge will apply to all Goods in storage on the first day of a calendar month.

B.     All charges are exclusive of all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any governmental authority on any amounts payable by Customer. Customer shall be responsible for all such charges, costs, and taxes; provided, that Customer shall not be responsible for any taxes imposed on, or with respect to, Company's income, revenues, gross receipts, personnel, or real or personal property.

C.     Customer is subject to and shall pay the minimum handling charge per lot and a minimum storage charge per lot per month specified on the Fee Schedule, if any.

D.     If Company pays any lawful transportation charges on behalf of Customer, Customer shall promptly reimburse Company for such charges, and in any case within five (5) business days after receiving an invoice for such charges from Company.

E.     Customer acknowledges that Company will only issue non-negotiable warehouse receipts.

8.     Payment Terms. Company shall invoice Customer for the Services monthly and Customer shall pay the charges for the Services within thirty (30) days of the date of the invoice.  Customer shall make all payments hereunder by wire transfer or check and in U.S. dollars.  Customer shall pay interest on all late payments at the rate of 1.5% per month, calculated and compounded daily from the date due until paid in full or, if less, the maximum amount permitted by law.  Customer shall reimburse Company for all costs incurred in collecting any late payments, including, without limitation, attorneys' fees.  In addition to all other remedies available under this Agreement or at law (which Company does not waive by the exercise of any rights hereunder), if Customer fails to pay any of the Obligations within thirty (30) days of the date on which Company provides notice to Customer of such failure, then Company shall be entitled to (i) suspend the release of any Goods, (ii) cease performance of the Services and (iii) suspend all deliveries of the Products under the Sales Orders.  In addition, Company reserves the right to require payment in full of all amounts owed by Customer, including any amounts owed relating to the Obligations, in advance of the release of the related Goods.  Customer shall not withhold payment of any amounts due and payable by reason of any set-off of any claim or dispute with Company, whether relating to Company's breach, bankruptcy, or otherwise.

9.     Limitation of Liability.

A.     Company shall not be liable for any loss or damage to the Goods tendered, stored, or handled, however caused (collectively, "Losses"), unless such Losses resulted from the failure by Company to exercise the level of care with regard to the Goods that a reasonably careful person would exercise under similar circumstances.  Company is not liable for Losses which could not have been avoided by the exercise of such care.

B.     Company shall not be liable for any Losses due to inventory shortage or unexplained or mysterious disappearance of Goods, unless Customer conclusively establishes by a preponderance of the evidence, as determined by a court of competent jurisdiction, that such Losses occurred because of Company's failure to exercise the care required of Company under Section 9A.  Any presumption of conversion under applicable law shall not apply to Losses with respect to any Goods, and a claim for conversion must be established through affirmative evidence that Company converted the Goods to its own use.  Customer shall permit Company to inspect any damaged Goods in its possession, and for which a claim is submitted hereunder.

C.     Unless expressly stated to the contrary in the Fee Schedule, Company shall not be required to store the Goods in a temperature or humidity controlled environment. Customer acknowledges and understands that the Goods will be warehoused in a non-temperature/humidity controlled environment, and that Company shall not be responsible for any Losses that result from fluctuations in temperature range or in humidity levels of the Warehouse. Customer further

Case 26-20713    Doc# 190    Filed 06/12/26    Page 7 of 19

acknowledges and understands that Company shall not be responsible for Losses of any perishable Goods, unless Customer conclusively establishes by a preponderance of the evidence, as determined by a court of competent jurisdiction, that such Losses occurred because of Company's failure to exercise the care required of Company under Section 9A.

D. Company shall not be liable for any loss or damage to the Goods unless: (i) Customer gives written notice to Company of any claim within sixty (60) days after Customer becomes or should have become aware of the loss or damage to the Goods or (ii) Customer is notified by Company that loss or damage to part or all of the Goods has occurred as the case may be, reasonably described. No lawsuit or other action may be maintained by Customer against Company for loss or damage to the Goods unless a timely written claim has been given by Customer as provided in the previous sentence and unless such lawsuit or other action is commenced no later than the earlier of: (x) within 2 (two) years of the loss or damage or (y) ninety (90) days after the date on which Customer becomes or should have become aware of the loss or damage to the Goods.

E. **IN NO EVENT SHALL COMPANY BE RESPONSIBLE OR LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, OR SPECIAL DAMAGES OF ANY TYPE OR NATURE WHATSOEVER AND HOWEVER ARISING, INCLUDING, WITHOUT LIMITATION, EXEMPLARY, OR PUNITIVE DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY (i) LOSSES OR (ii) BREACH OF ANY PROVISION OF THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED IN ADVANCE BY CUSTOMER OR COULD HAVE BEEN REASONABLY FORESEEN, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.**

**UNLESS OTHERWISE AGREED TO BY THE PARTIES, IN NO EVENT SHALL COMPANY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, COMPANY'S LIABILITY UNDER SECTION 9 OF THIS AGREEMENT, EXCEED THE REPLACEMENT VALUE OF THE GOODS (AS DEFINED BELOW), NET OF ANY PROCEEDS CUSTOMER IS ENTITLED TO RECOVER UNDER THE INSURANCE POLICY REQUIRED BY SECTION 10.B.**

F. For purposes of this Section 9, the term "Replacement Value of the Goods" means the aggregate amount that Customer would have to pay to replace any lost, damaged or destroyed Goods, for which Company is legally liable, with new Goods of a like kind or quality, as determined by an impartial national insurance company, or other appraiser ("Appraiser"), mutually acceptable to Company and Customer. If the Parties are unable to agree on an Appraiser, one shall be appointed by the Superior Court of the State of California, County of Sacramento. Each Party shall pay one-half (1/2) of the Appraiser's fee.

G. In the case of loss or damage to the Goods for which Company is not liable, Customer shall be responsible for all charges incurred in removing and disposing of the Goods, including any environmental clean-up and remediation costs related to the Goods and their removal and disposal.

10. Insurance.

A. Company does not represent or warrant that the Warehouse or the contents of the Warehouse cannot be destroyed by fire or any other cause. Goods are not insured by Company for the benefit of Customer against fire or other casualty. Company will not be required to maintain a watchman or a sprinkler system, and Customer acknowledges that Company's failure to do so will not constitute negligence under Section 9(a) or otherwise. Goods are not insured by Company for the benefit of Customer against fire or other casualty.

B. During the Term (as defined below) and for a period of ninety (90) days thereafter, Customer shall, at its own expense, maintain and carry insurance in full force and effect against fire or other casualty in a sum no less than the current market value of the Goods with financially sound and reputable insurers. Upon Company's request, Customer shall provide Company with a certificate of insurance from Customer's insurer evidencing the insurance coverage specified in this Agreement. The certificate of insurance shall name Company as an additional insured. Customer shall provide Company with

thirty (30) days' advance written notice in the event of a cancellation or material change in Customer's insurance policy. Except where prohibited by law, Customer shall require its insurer to waive all rights of subrogation against Company's insurers and Company.

11. Term; Renewal; Termination.

A. The term of this Agreement shall commence on the Effective Date and shall continue until the date that is one (1) year from the Effective Date (the "Initial Term"), unless earlier terminated in accordance with this Section 11.

B. Upon expiration of the Initial Term, this Agreement shall automatically renew for additional successive one (1) year terms (each, a "Renewal Term", and, together with the Initial Term, the "Term"), unless either Party provides the other Party with written notice indicating non-renewal of the Term at least 60 days prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable.

C. In addition to any remedies that may be provided under this Agreement, Company may terminate this Agreement with immediate effect upon written notice to Customer, if: (i) Customer fails to pay any amount when due under any of the Obligations and such failure continues for thirty (30) days after the due date of Company's invoice; (ii) Customer has not otherwise performed or complied with the Obligations or any of the terms or conditions contained in this Agreement or any Sales Order, in whole or in part; (iii) Customer becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization, or assignment for the benefit of creditors; (iv) the Goods are a hazard to other property within the Warehouse or to the Warehouse itself or to persons as a result of the quality or condition of the Goods of which Company had no notice at the time of deposit; or (v) the Goods are about to deteriorate or decline in value to less than the amount of the warehouse lien set forth in Section 6 before the end of the next succeeding storage month.

D. This Agreement may be canceled by Company upon ninety (90) days' prior written notice with or without any cause or reason being given or required and will be terminated without notice by either Party if no storage or other services are performed under this Agreement for a period of thirty (30) consecutive days.

E. If this Agreement is terminated for any reason, Customer shall promptly arrange the removal of all Goods from the Warehouse, subject to payment of all outstanding fees and charges due hereunder. If Customer does not promptly remove such Goods, Company may without liability remove the Goods and sell the Goods at public or private sale without advertisement and with or without notification to all persons known to claim an interest in the Goods (to the last known place of business of the person to be notified) in the manner provided by law. If Company, after a reasonable effort, is unable to sell the Goods, it may dispose of them without liability in any lawful manner.

12. Waiver. No waiver by Company of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Company. No failure by Company to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise by Company of any right, remedy, power, or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

13. Force Majeure. Company shall not be liable or responsible to Customer, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of Company including, without limitation, acts of God, flood, fire, wind, weather, earthquake, explosion, moths, rodents, sprinkler leakage or malfunction, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest, national emergency, revolution, insurrection, epidemic, pandemic, lockouts, strikes or other labor disputes (whether or not relating to either Party's workforce), restraints or delays affecting carriers, inability or delay in obtaining supplies of adequate or suitable materials, materials, telecommunication breakdown, power outage, cyber-attacks, pilferage or theft (unless as a result of Company's failure to exercise reasonable care).

If Company has been unable to remove/deliver the Goods due to any reason specified in this Section 13, such Goods shall be subject to storage charges until such Goods are actually removed/delivered.

14.      Third-Party Beneficiaries.  Except as specified in the next sentence, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of these terms.  Notwithstanding the foregoing, all limitations upon, and exceptions and defenses to, liability granted to Company shall be automatically extended to all parent, subsidiary, and affiliated entities of Company and the owners, directors, officers, employees, and agents of each of the foregoing.  Customer agrees that Company's officers, directors, shareholders, employees, agents, affiliates, successors, and permitted assigns are third-party beneficiaries of the indemnification provision set forth in Section 3 of this Agreement.

15.      Choice of Law and Forum.  All matters arising out of or relating to this Agreement are governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than those of the State of California.  Any legal suit, action, or proceeding arising out of or relating to this Agreement shall be instituted in the federal courts of the United States of America or the courts of the State of California in each case located in the City of Sacramento and County of Sacramento, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

16.      Waiver of Jury Trial.  Each Party acknowledges and agrees that any controversy that may arise under this Agreement, including exhibits and other attachments to this Agreement, is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives, to the maximum extent permitted by law, any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement, including any exhibits and other attachments to this Agreement, and the transactions contemplated hereby.

17.      Survival.  Subject to the limitations and other provisions of this Agreement, the representations and warranties of the Parties contained herein and the provisions of Sections 3, 4, 6 through 10 and 12 through 26 of this Agreement shall survive the expiration or earlier termination of this Agreement.

18.      Notices.  All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "Notice") must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section 18).  Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier, or certified or registered mail (in each case, return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a notice is effective only (a) on receipt by the receiving Party, and (b) if the Party giving the Notice has complied with the requirements of this Section 18.

| | |
|---|---|
| Notice to Company: | American River Ag, Inc.<br>5075 Hillsdale Circle<br>El Dorado Hills, CA 95762<br>Attention: Todd Balestrieri, Chief Financial Officer and Vice President |
| Notice to Customer: | Integrated Proteins<br>1801 NW Plate Dr., Ste. 200<br>Riverside, MO 64150<br>Attention: Ben Hubbard, COO and General Counsel |

19.      Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the provision, covenant or condition determined to be invalid, void or unenforceable does not materially alter the essential terms of this Agreement.

20. <u>Amendments</u>.  No amendment to or modification of or rescission of this Agreement is effective unless it is in writing, identified as an amendment to, modification of or rescission of this Agreement and signed by an authorized representative of each Party.

21. <u>Cumulative Remedies</u>.  All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.  Notwithstanding the previous sentence, the Parties intend that Customer's rights under Section 9 are Customer's exclusive remedies for any breach of Company's obligations set forth in this Agreement.  <u>Assignment</u>.  Customer shall not assign (including by operation of law), transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Company.  Any purported assignment or delegation in violation of this Section 22 shall be null and void.  No assignment or delegation shall relieve Customer of any of its obligations hereunder.  Company may at any time assign, transfer, or subcontract any or all of its rights or obligations under this Agreement without Customer's prior written consent.

22. <u>Successors and Assigns</u>.  This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

23. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.  Notwithstanding anything to the contrary in Section 18, a signed copy of this Agreement delivered by facsimile or email or other means of electronic transmission shall be given the same legal effect as delivery of an original signed copy of this Agreement.

24. <u>Entire Agreement</u>.  The terms and conditions of this Agreement, together with the Fee Schedule, quotations, terms and conditions contained in any warehouse receipts issued by Company for the Goods stored under this Agreement, and the terms and conditions of any Sales Order constitute the sole and entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

25. <u>Headings; Interpretation and Construction</u>.  The headings to sections of this Agreement are inserted for convenience of reference only and in no way define, limit or describe the scope of this Agreement or the meaning of any provisions of this Agreement.  The exhibits attached hereto shall be deemed to be incorporated in and an integral part of this Agreement.  In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of any warehouse receipt issued to Customer in connection with the Goods, the terms and conditions of this Agreement shall supersede and control.

26. <u>Relationship of the Parties</u>.  The relationship between the Parties is that of independent contractors.  Nothing contained in this Agreement shall be construed as creating any agency, partnership, franchise, business trust, joint venture, or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.  No relationship of exclusivity shall be construed from this Agreement.

*[Signature page follows]*

Case 26-20713    Doc# 190    Filed 06/12/26    Page 11 of 19

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**COMPANY:**

**AMERICAN RIVER AG, INC.**,
a California corporation

By: _____

Name:  **Todd Balestrieri**

Title:    **CFO/ VP**


**CUSTOMER**:

**INTEGRATED PROTEINS, LLC**,
a Wyoming limited liability company

By: _____

Name:  **Joe Hubbard**

Title:    **CEO**


*Must be a company Officer or Authorized Signer*

Case 26-20713    Doc# 190    Filed 06/12/26    Page 12 of 19



**AMERICAN RIVER AG**
*CULTIVATING QUALITY INGREDIENTS*

# Warehouse Fee Schedule
*Transloading / Warehousing*

**EXHIBIT A**

| SERVICE *Minimum Charge $200.00* | Unit of Measure | Tier 1 *40,001+* *Ton Annually* | Tier 2 *40,000 - 20,001* *Ton Annually* | Tier 3 *20,000-* *Ton Annually* | Tier 4 - Marine *20,000-* *Ton Annually* |
|---|---|---|---|---|---|
| Unload Bulk Railcar | Per Ton | $20.00 | $21.00 | $22.00 | $23.00 |
| Unload Bulk/Toted Truck | Per Ton | $20.00 | $21.00 | $22.00 | $23.00 |
| Unload Bulk/Toted Container | Per Ton | $23.00 | $24.00 | $25.00 | $26.00 |
| Unloading Vessel | Per Vessel | Call | Call | Call | Call |
| Load Bulk Railcar | Per Ton | $20.00 | $21.00 | $22.00 | $23.00 |
| Load Bulk/Toted Truck | Per Ton | $11.00 | $12.00 | $13.00 | $14.00 |
| Load Bulk/Toted Container | Per Ton | $26.00 | $27.00 | $28.00 | $29.00 |
| **PER LOAD SERVICES** (Standard) | | | | | |
| Additives Service | Per Load | $50.00 | $52.50 | $55.00 | $57.50 |
| Bagging Service (Approx. 50lb. bag - Includes bag) | Per Ton | $125.00 | $130.00 | $135.00 | $140.00 |
| Blending Service | Per Ton | $60.00 | $65.00 | $70.00 | $75.00 |
| Disposal - Bladder | Per Bladder | $700.00 | $750.00 | $800.00 | $800.00 |
| Disposal - Bulk Container Liner | Per Container | $25.00 | $30.00 | $35.00 | $40.00 |
| Disposal - Pallet | Per Pallet | $10.00 | $12.50 | $15.00 | $15.00 |
| Disposal - Tote | Per Tote | $5.00 | $6.50 | $8.00 | $8.00 |
| Grinding Service | Per Ton | $27.50 | $30.00 | $32.50 | $35.00 |
| Labor | Per Hour | $100.00 | $110.00 | $120.00 | $130.00 |
| Pallets | Per Pallet | $25.00 | $27.50 | $30.00 | $30.00 |
| Pelleting Service | Per Ton | $110.00 | $120.00 | $130.00 | $140.00 |
| Sampling Service | Per Sample | $20.00 | $22.50 | $25.00 | $27.50 |
| Screening Service | Per Ton | $42.50 | $45.00 | $47.50 | $50.00 |
| Shrink Wrap | Per Load | $300.00 | $325.00 | $350.00 | $350.00 |
| Slip Sheets | Per Load | $300.00 | $325.00 | $350.00 | $350.00 |
| Tote Bulk Out | Per Ton | $17.50 | $20.00 | $22.50 | $25.00 |
| Toting Service (Approx. 2,000lb. tote - Includes tote bag) | Per Ton | $110.00 | $120.00 | $130.00 | $140.00 |
| **MISCELLANEOUS SERVICES** | | | | | |
| Facility Inspection or Audit | Per Day | $1,000.00 | $1,200.00 | $1,400.00 | $1,400.00 |
| Fumigation | Per Fumigation Stack | $500 + Fume Invoice | $600 + Fume Invoice | $700 + Fume Invoice | $700 + Fume Invoice |
| Less than 24 Hour Notice | For Shipments & Deliveries | $400.00 | $425.00 | $450.00 | $475.00 |
| Load Locks | Per Lock | $125.00 | $130.00 | $135.00 | $135.00 |
| Load Straps | Per Strap | $35.00 | $40.00 | $45.00 | $45.00 |
| Over Time Labor | Per Hour | $145.00 | $160.00 | $175.00 | $175.00 |
| Port of Stockton Rail Charge | Per Railcar | $50.00 | $55.00 | $60.00 | $60.00 |
| Problematic Load | Per Load | $750.00 | $800.00 | $850.00 | $900.00 |
| Railcar Inspection | Per Railcar | $50.00 | $55.00 | $60.00 | $60.00 |
| Railcar Weigh Service | Per Ton | $3.00 | $3.50 | $4.00 | $4.50 |
| Security Seals – Standard (Plastic) | Per Seal | $4.75 | $5.00 | $5.25 | $5.25 |
| Security Seals - Premium (Metal) | Per Seal | $8.75 | $9.00 | $9.25 | $9.25 |
| Specialty Projects | Per Project | Call | Call | Call | Call |
| Trailer Inspection | Per Trailer | $20.00 | $22.50 | $25.00 | $25.00 |
| Weekend Projects | Per Hour / Per Warehouse Person | $145.00 | $160.00 | $175.00 | $175.00 |
| **STORAGE / RENTAL** *Minimum Storage Charge $500.00 Per Month* | | | | | |
| Storage – Bulk (Outside Yard) | Per Acre / Monthly | $7,000.00 | $7,500.00 | $8,000.00 | $8,000.00 |
| Storage – Lab | Per Space / Monthly | $6,500.00 | $6,600.00 | $6,700.00 | $6,700.00 |
| Storage - Conventional (After 30 Days) | Per Ton | $8.50 | $9.00 | $9.50 | $10.00 |
| Storage – Organic (After 30 Days) | Per Ton | $10.50 | $11.00 | $11.50 | $12.00 |
| Storage – Railcar | Per Month | $1,500.00 | $1,600.00 | $1,700.00 | $1,700.00 |
| Forklift Rental (96" Large Forks) | Per Day | $600.00 | $625.00 | $650.00 | $650.00 |

EXHIBIT 2

**Post Petition Transactional Class: Transload**

**Memorandum of Understanding**

Integrated Proteins, LLC ("Customer" or "Debtor") and American River Ag Inc. ("Transloader") have reached an understanding and agreement regarding certain terms and conditions whereby goods ("Subject Inventory") currently located at Stockton, California ("Warehouse") can be released, transported, stored, handled, transloaded, and related payments for costs and fees can be completed. The Transloader asserts that it has retained possession and/or control of the Subject Inventory and holds, or reserves all rights to assert, a warehouseman's lien, storage lien, possessory lien, statutory lien, contractual lien, replacement lien, and/or other applicable lien or interest in the Subject Inventory, New Product, and Inventory and requested payment therefor. The Debtor desires to transfer and sell the Subject Inventory and pay for the services and charges of the Transloader ("Subject Services"). The Debtor further acknowledges that the Transloader holds a liquidated claim against the Debtor as of May 6, 2026 ("Petition Date") in the amount of $1,483,118.79 ("Pre-Petition Claim") plus post-petition interest at the rate of 10% per annum, costs, expenses and reasonable attorneys' fees. The Transloader has been reported on the Debtor's Critical Vendor Motion and related order.

Therefore, the parties agree as follows:

1. <u>Post-Petition Services and Payment Terms</u>. The Transloader and the Debtor desire to handle and transload store, release, and transload the Subject Inventory located at the Warehouse on the Petition Date together with additional inventory ("New Product") to be purchased or delivered after the Petition Date. Subject Inventory and New Product shall collectively be referred to as "Inventory." Transloader shall invoice Customer weekly, on Mondays or the next business day, for all post-petition services, storage, handling, transloading, freight-related charges, pass-through costs, and other amounts arising after the Petition Date. Post-petition invoices shall be due Net 15 from the invoice date. Notwithstanding the Net 15 term, Debtor shall make weekly payments each Tuesday, or the next business day, in an amount sufficient to keep all post-petition invoices current and to ensure that no undisputed post-petition invoice remains unpaid beyond Net 15. Post-petition payments are separate from, and in addition to, the Weekly Pre-Petition Payment described below.

2. <u>No Post-Petition Arrearage</u>. Debtor shall remain current on all post-petition invoices. Any undisputed post-petition invoice not paid within Net 15, or any failure to make the required weekly payment needed to keep post-petition invoices current, shall constitute a default under this Memorandum of Understanding. Debtor shall not offset, delay, recoup, or withhold post-petition payments based on any pre-petition claim, cash collateral dispute, inventory sale timing, or other issue not directly related to the specific post-petition invoice at issue. Any dispute as to a post-petition invoice must be made in writing within five (5) business days after receipt of the invoice and must state the specific disputed amount and reason; all undisputed portions shall be paid when due.

3. <u>Lien Rights, Replacement Liens, and Reservation of Rights</u>. The Transloader asserts and reserves all rights, claims, liens, security interests, warehouseman's lien rights, storage lien rights, possessory lien rights, contractual lien rights, statutory lien rights, administrative expense rights, reclamation rights, rights of adequate protection, and other rights and remedies with respect to the Inventory and all amounts owed to Transloader. Debtor agrees that Transloader shall have replacement liens on New Product and Inventory to secure all amounts owed to Transloader to the fullest extent permitted by applicable law and any applicable Bankruptcy Court order. To the extent the replacement liens or Inventory coverage result in a value less than the value of the Subject Inventory on the Petition Date or less than the amounts owed to Transloader, Transloader reserves and shall not waive any right to assert an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code or any other applicable priority, lien, or adequate protection claim.

4. <u>Pre-Petition Claim and Weekly Pre-Petition Payment</u>. The Transloader holds a Pre-Petition Claim against Debtor in the amount of $1,483,118.79 plus post-petition interest at the rate of 10% per annum, costs, expenses and reasonable attorneys' fees, consisting of unpaid warehouse services, storage, transload, handling, and/or ingredient sale obligations incurred before the Petition Date. The Debtor agrees to pay the Transloader $17,500.00 per week (the "Weekly Pre-Petition Payment"). The Weekly Pre-Petition Payment is a fixed weekly payment obligation and is not merely an estimate, placeholder, or proportional allocation of any general critical vendor budget.

5. <u>Application of Payments</u>. Unless otherwise required by a final, non-appealable Bankruptcy Court order, the Weekly Pre-Petition Payment shall be applied solely to reduce the unpaid balance of the Pre-Petition Claim together with post-petition interest at the rate of 10% per annum, costs, expenses and reasonable attorneys' fees. Payments on post-petition invoices shall be applied solely to post-petition invoices unless Transloader agrees otherwise in writing. The parties agree that the Weekly Pre-Petition Payment is in addition to, and shall not reduce, replace, defer, or impair Debtor's obligation to pay all post-petition invoices according to the Net 15 and weekly-current terms set forth above.

6. <u>Minimum Inventory Coverage Covenant</u>. Until the Pre-Petition Claim and all post-petition amounts owed to Transloader are paid in full, Debtor shall maintain Inventory at the Warehouse with an aggregate value not less than 1.2 times the total unpaid balance of all amounts then owed to Transloader, including the unpaid Pre-Petition Claim, all unpaid post-petition invoices, accrued charges, storage, handling, freight-related charges, pass-through costs, and any other amounts owed to Transloader (collectively, the "ARA AR Balance"). This required inventory value is referred to as the "Minimum Inventory Coverage Amount." For purposes of this covenant, Inventory value shall be measured using the lower of Debtor's book value, cost value, or ordinary-course sale/invoice value, unless the parties agree in writing to another valuation method.

7. <u>Restriction on Releases Below Coverage Floor</u>. Debtor shall not request, direct, cause, or permit any release, shipment, transfer, sale, withdrawal, substitution, or removal of Inventory from the Warehouse if, after giving effect to such release or removal, the remaining Inventory at the Warehouse would have a value less than the Minimum Inventory Coverage Amount. Transloader may decline, hold, delay, or condition any release, shipment, transfer, or handling of Inventory as necessary to maintain the Minimum Inventory Coverage Amount, to preserve Transloader's lien rights, and to ensure Debtor remains current on all Weekly Pre-Petition Payments and post-petition payment obligations. No release of Inventory shall constitute a waiver of Transloader's lien rights, claim rights, administrative expense rights, or rights to payment unless expressly agreed in writing by Transloader.

8. <u>Inventory Reporting and Reconciliation</u>. Upon execution of this Memorandum of Understanding and weekly thereafter, Debtor shall provide Transloader with a current inventory report identifying the Inventory located at the Warehouse, including product description, quantity, lot number if applicable, book value, cost value, ordinary-course sale/invoice value, and any proposed releases for the following week. Debtor shall also provide a weekly reconciliation of the ARA AR Balance and the Minimum Inventory Coverage Amount. Transloader may reasonably request additional backup needed to confirm Inventory value, Inventory quantity, pending releases, and payment status.

9. <u>Conditions to Continued Releases and Services</u>. The Weekly Pre-Petition Payment shall be paid to Transloader once each week on Tuesdays, or the next business day if Tuesday is not a business day. Transloader's obligation to continue providing Subject Services, releasing Inventory, or accepting New Product is conditioned on all of the following: (i) Debtor timely makes each Weekly Pre-Petition Payment; (ii) Debtor remains current on post-petition invoices under the Net 15 and weekly-current payment terms; (iii) the Inventory at the Warehouse does not fall below the Minimum Inventory Coverage Amount; (iv) the Bankruptcy Court has approved the Debtors' cash collateral budget and there has been no event of default that prevents the agreed payments; and (v) Debtor continues to support payment of the agreed amounts to Transloader. Transloader shall not be required to provide services on credit, release Inventory, or accept additional Inventory if any of the foregoing conditions are not satisfied.

10. <u>Default and Remedies</u>. Each of the following shall constitute a default: (i) failure to make any Weekly Pre-Petition Payment when due; (ii) failure to make weekly payments sufficient to keep all post-petition invoices current and within Net 15; (iii) failure to maintain the Minimum Inventory Coverage Amount; (iv) release or attempted release of Inventory that would reduce Inventory below the Minimum Inventory Coverage Amount; (v) failure to provide required inventory reporting or reasonable backup; or (vi) any material breach of this Memorandum of Understanding. Upon default, Transloader may, without waiving any rights or remedies, suspend further services, refuse or condition further releases, require payment in advance or COD terms, assert and enforce any lien rights or administrative expense rights, seek relief from the Bankruptcy Court, and pursue any other rights or remedies available under applicable law, contract, or Bankruptcy Court order. Debtor shall promptly notify Diamond Pet in writing with a copy to Transloader of the occurrence of a default under paragraph 10(iii) or 10(iv).

11. <u>Court Approval</u>. Debtor shall promptly seek and diligently pursue Bankruptcy Court approval of this Memorandum of Understanding and the payments, replacement liens, Inventory coverage protections, and continued transactions contemplated herein.

12. <u>No Waiver; Reservation of Rights</u>. Nothing in this Memorandum of Understanding shall be deemed a release, waiver, satisfaction, novation, accord and satisfaction, or compromise of the Pre-Petition Claim, any post-petition claim, any lien, any administrative expense claim, any reclamation claim, any adequate protection claim, or any other right or remedy of Transloader, except to the extent of actual payments received and cleared by Transloader and applied in accordance with this Memorandum of Understanding.

**13.** The aforementioned terms may only be modified by the parties pursuant to a written addendum to this Memorandum of Understanding duly executed by the Debtor's Chief Restructuring Officer and by a duly authorized representative of the Transloader.

Agreed to this _____ day of June 2026 by:

**Integrated Proteins, LLC**

By: _____

David R. Payne

Chief Restructuring Officer

Date: _____

**American River Ag Inc.**

By: _____

Printed: _____

Title: _____

Date: _____

4000 Cedar Blvd LLC
Attn Matthew Reich
172 S Broadway
White Plains NY 10605

American River Ag Inc
PO Box 4452
El Dorado Hills CA 95762

ASCENTIUM CAPITAL
ATTN BANKRUPTCY
23970 US 59 NORTH
KINGWOOD TX 77339-1535

Badger Ingredients Inc
PO Box 2465
Carefree AZ 85377-2465

Bluerock Capital LLC
Attn Officer or Agent
919 3rd Ave
40th Floor Suite 4000
New York NY 10022-3902

Commodity Services Inc
1501 South State St Suite 200
Fairmont MN 56031

Cottingham  Butler
800 Main St
Dubuque IA 52001-6807

Daimler Truck Financial
14372 Heritage Parkway Ste 400
Fort Worth TX 76177

Department of Finance and
Administration
PO BOX 896 Rm 2340
Little Rock AR 72203-0896

EN OD Capital
1202 Avenue U Ste 1115
Brooklyn NY 11229

Farmers Union Industries
220 Ponderosa Road
Redwood Falls MN 56283

Fiordo Austral
5815 Windward Pkwy
Alpharetta GA 30005

First Interstate Bank
PO Box 30918
Billings MT 59107

First Interstate Bank
PO Box 31193
Billings MT 59107

First Interstate Bank
Attn Officer
401 N 31st St
Billings MT 59101

Harper Advance LLC
c/o Hassett & George PC, Reg Agent
945 Hopmeadow Street
Simsbury CT 06070

Huntington National Bank
11100 Wayzata Blvd Ste 700
Hopkins MN 55305

JBB Capital
109 S Northshore Dr Ste 200
Knoxville TN 37919

Jonathan Meilike
2330 S 12th St
St Joseph MO 64503-2940

KAW Services Inc
9100 W Liberty Drive
Pleasant Valley MO 64068-7500

Kompass Kapital Funding LLC
Attn Officer or Agent
9800 Metcalf Ave
Overland Park KS 66212

Matts Truck and Trailer Repair
3807 S Leonard Rd
Saint Joseph MO 64503

MODOT
105 W Capital Ave
Jefferson City MO 65101-6811

NewCo Capital Group VI LLC
333 W Commercial Street Ste 324
East Rochester NY 14445

NewCo Capital Group VI LLC
Attn Officer or Agent
Co VCorp Agent Services Inc
25 Robert Pitt Drive Ste 204
Monsey NY 10952

Northland Capital Financial
Services LLC
Po Box 7278
Saint Cloud MN 563027278

Novus Capital Funding II LLC
Attn Officer or Agent
co The LLC
54 State Street Ste 804
Albany NY 12207

Palisade Advance LLC
Attn Officer or Agent
2447 47th Street
Astoria NY 11103

PNC BANK RETAIL LENDING
P O BOX 94982
CLEVELAND OH 44101-4982

Sanders Trailer Service Inc
13743 Kafir Road
Carthage MO 64836-9381

Schroeder Country Products
9 Leisure Lane
McCook Lake SD 57049

Seneca Trading LLC
317 S Main Street Ste 201
Findlay OH 45840

Shipwell Inc
PO BOX 30372
Austin TX 78755-3372

Spring Funding FL LLC
4601 Sheridan Street Ste 600
Hollywood FL 33021

Spring Funding FL LLC
Attn Officer or Agent
co Corporate Creations Network Inc
801 US Highway 1
North Palm Beach FL 33408

Sumitomo Mitsui Finance
and Leasing Company Ltd
666 Third Avenue 8th Floor
New York NY 10017

UniFi Equipment Finance Inc
801 W Ellsworth Rd
Ann Arbor MI 48108

Visa Capital LLC
co Lien Solutions
UCC MO 20250806001076941
PO Box 29071
Glendale CA 91209-9071

Wallwork Financial
401 38th Street SW
PO Box 628
Fargo ND 58107

Webbank Libertas Funding LLC
411 West Putnam Avenue Ste 220
Greenwich CT 06830

Internal Revenue Service
PO Box 7346
Philadelphia PA 191017346

INTERNAL REVENUE SERVICE
ATTN Insolvency/Advisory
2850 NE Independence Ave
Stop 5334 LSM
Lees Summit MO 64064−2327

Integrated Proteins LLC
1480 NW Vivion Road
Kansas City MO 64118

NutriHub LLC
1480 NW Vivion Road
Kansas City MO 64118

HFO Logistics LLC
1480 NW Vivion Road
Kansas City MO 64118

Attn: Ally Bank Department
AIS Portfolio Services, LLC
Account: XXXXXXXX5850
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118-7901

BlueRock Capital LLC
Maurice Wutscher LLP
23611 Chagrin Blvd
Suite 207
Beachwood, OH 44122

Christine A. Neuharth, Sr. Counsel
Union Pacific Railroad Company
1400 Douglas St.
Omaha, NE 68179

ASHBY & GEDDES, P.A.
Gregory A. Taylor
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

Farmers Union Industries, LLC
Brendan Rouzer, CFO
P.O. Box 319
20 Ponderosa Road
Redwood Falls, MN 56283

Badger Ingredients, Inc.
Henry Holling, CFO/Owner
P.O. Box 2465
Carefree, AZ 85377

Commodity Services, Inc.
Allison Schwandt, Bus. Ofc Mgr.
1501 S. State St., Suite 200
Fairmont, MN 56031

Schroeder Country Products
Ted Schroeder, Vice President
9 Leisure Lane
North Sioux City, SD 57049

Seneca Trading, LLC
Michael Gill, General Manager
317 S. Main St., Suite 201C
Findlay, Ohio 45840

24/7 Express Solutions LLC
1851 Southern Rd.
Kansas City, MO 64120-1111

Accurate Superior Scale of KC Inc
1830 Linn St
North Kansas City, MO 64116-3627

Ace Scale Company
1701 Roseport Road
Elwood KS 66024

AIRGAS USA LLC
110 W 7TH STREET
TULSA OK 74119-1031

Alliance Maintenance Inc
2770 Washington Dr. Ste 110
Norman OK 73069-1016

Anchor Acceptance Corporation
PO Box Box 860
North Sioux City SD 57049-0860

Badger Ingredients, Inc.
Lathrop GPM LLP, c/o Steve Sutton
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108-2618

Byline Financial Group
2801 Lakeside Dr Ste 212
Deerfield IL 60015-1200

Cereal Byproducts Company
PO BOX 6700
Carol Stream IL 60197-6700

CSC Logistics LLC
11880 COLLEGE BLVD
OVERLAND PARK KS 66210-2766

Commercial Capital Company, L.L.C.
Attn:  Stephen D. McGiffert
11000 King Street
Overland Park, KS 66210-1286

Continental Fire Sprinkler
4518 S 133rd Street
Omaha, NE 68137-1141

EVERGY  INC
PO BOX 11739
KANSAS CITY MO 64138-0239

Flexport Inc
760 Market St 8th Floor
San Francisco CA 94102-2300

Foley Industries, Inc.
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-6605

Hill Brothers Transportation Inc
11620 M Circle
Omaha NE 68137-2231

Kingdom Kapital
80-02 Kew Gardens Rd, Ste. 600
Kew Gardens, NY 11415-3606

LEAF Commercial Capital Inc
One Commerce Square
2005 Market St 14th Fl
Philadelphia PA 19103-7009

Northland Capital Financial Services, LLC
333 33rd Ave S
St Cloud, MN 56301-5495

Northwest Transportation Services, Inc.
7111 NE 178th Street
 Vancouver, WA 98686

Todds Tire Service
20451 Highway 169 North
St Joseph MO 64505-8531

US Commodities, LLC
730 Second Ave. S. Suite 700
Minneapolis, MN 55402-2480

Kuehne + Nagel, Inc.
950 - 900 Howe Street, 9th Floor
Vancouver, BC V6Z 2M4
Canada