**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re:<br>INTEGRATED PROTEINS, LLC, et al.,<br><br>Debtors. | Case No. 26-20713-11<br>Chapter 11<br>(Lead Case; Jointly Administered) |
| INTEGRATED PROTEINS, LLC,<br><br>Plaintiff,<br>v.<br><br>CORE FUNDING SOURCE LLC,<br><br>Defendant. | Adv. No. 26-__________ |

**COMPLAINT**

Plaintiff Integrated Proteins, LLC ("IP" or "Plaintiff"), debtor and debtor in possession, states the following against Defendant Core Funding Source LLC ("Core"):

## I. NATURE OF THE ACTION

1. This is one of a series of adversary proceedings brought against merchant cash advance funders whose agreements are sales in form but loans in substance.

2. Core advanced funds under an agreement dated March 13, 2026 (the "Agreement"), attached as Ex. A.

3. The Agreement, which Core styles "Standard Merchant Cash Advance Agreement," calls itself a purchase of receivables and disclaims any loan.

4. The Agreement's operation shows that it is a loan:

a. the remittances are fixed;

b. the periodic payment may be doubled at Core's election on a covenant breach;

c. Core claims a security interest in all assets;

d. on default Core is entitled to a contingency fee of up to forty percent of the amount claimed, and to pre-judgment and post-judgment interest at twenty-four percent per annum; and

e. on default the entire uncollected balance and all fees become due and payable in full immediately.

5. The only merchant named on the Agreement itself is Hubbard Ingredients, LLC ("HI").

6. IP is not named anywhere in the Agreement. It is only listed on an Addendum, which purports to add IP as a "Merchant."

7. Core advanced the purchase price to HI, and the Agreement states the net amount to be received directly by HI as $970,000.00.

8. Two ACH authorizations were delivered with the Agreement, one stating a payment amount of $45,300.00 weekly and the other a payment amount of $9,060.00 daily. Each names HI as the account holder and designates an account in HI's name at Nodaway Valley Bank. IP is not named on either authorization, and no account of IP is designated on either.

9. No consideration for the receivables Core claims to have purchased moved from Core to IP, and Core never made a single payment to IP in any amount. Whatever funds reached IP came from Hubbard Ingredients, LLC in its own right and not from Core.

10. IP never made a single payment directly to Core.

11. Because the transaction is a loan, IP owns its accounts receivable.

12. Core holds at most a security interest in IP's assets, and not ownership of them.

13. Core nevertheless filed a financing statement naming Integrated Proteins LLC as a debtor. Any interest Core asserts is in any event unperfected as to IP because Core filed no financing statement in Wyoming, IP's state of organization, and is avoidable under 11 U.S.C. § 544(a).

14. Separately, any security interest held by Core in IP's assets is wholly unsecured by value under 11 U.S.C. § 506(a), because it sits behind more than $32 million of senior perfected debt against receivables worth less than $9 million.

15. The obligations IP incurred without consideration are invalid as failing to support a contract, and thus any claim of Core should be disallowed.

16. IP seeks judgment quieting title to its receivables, a declaration that the Agreement is void for lack of consideration and if not void is a loan, avoidance of Core's unperfected and unattached lien, avoidance of IP's obligations to Core if any were incurred, disallowance of Core's proof of claim, injunctive relief restraining Core from demanding, collecting, applying, or otherwise exerting control over any receivables generated by IP pending final judgment, and an order barring the release, distribution, or setoff of the adequate-protection allocation held in escrow on account of Core's asserted interest.

## II. JURISDICTION AND VENUE

17. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the District of Kansas.

18. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), (M), and (O).

19. To the extent any claim is non-core, IP consents to the entry of final orders and judgment by this Court under 28 U.S.C. § 157(c)(2) and Fed. R. Bankr. P. 7008 and 7012.

20. Venue is proper under 28 U.S.C. §§ 1408 and 1409 because this proceeding arises in and relates to IP's case pending in this District.

21. The statutory and rule predicates for relief include 11 U.S.C. §§ 105, 361, 362, 363, 502, 506, 544, 548, 551, and 552, and Fed. R. Bankr. P. 7001.

## III. PARTIES

22. IP is a Wyoming limited liability company, registered as a foreign limited liability company in Kansas and Missouri, and the debtor in possession in Case No. 26-20713-11, filed May 6, 2026 (the "Petition Date"). IP is located in Wyoming for purposes of Article 9 of the Uniform Commercial Code, as shown by its Wyoming Articles of Organization.[1] Its location for perfection under U.C.C. §§ 9-301 and 9-307(e) is Wyoming. As debtor in possession, IP exercises the rights and powers of a trustee under 11 U.S.C. § 1107(a), including the avoiding powers conferred by 11 U.S.C. §§ 544 and 548.

23. Core Funding Source LLC is a California limited liability company, entity number 202118710341, formed July 1, 2021, with its principal and mailing address at 8549 Wilshire Blvd, Suite 852, Beverly Hills, California 90211, and an agent for service of process, Howard Elyashar, at 16255 Ventura Blvd, Suite 1018, Encino, California 91436. Core Funding Source LLC is also registered as a foreign limited liability company in New York, DOS ID 7323238, and gives 49

---

[1] Ex. B (IP Wyoming Articles of Organization).

Front St, Rockville Centre, New York 11570, the same address stated in the Agreement, as its address for service by the New York Department of State.[2] Its proof of claim gives 124 Grove Avenue Suite 194, Cedarhurst, NY 11516 for notices and payments and the claim was filed by Kaminski Law PLLC, P.O. Box 247, Grass Lake, Michigan 49240.[3] It may be served under Fed. R. Bankr. P. 7004(b)(3) at any of these addresses, attention of an officer, managing agent, or general agent.

## IV. FACTUAL BACKGROUND

### A. IP and Its Senior Secured Debt

24. On the Petition Date, First Interstate Bank ("FIB") held a first priority perfected secured claim against IP, secured by the receivables of IP, in the amount of $22,253,300.10.

25. On the Petition Date, Kompass Kapital Funding, LLC ("Kompass") held a second priority perfected claim of $9,538,269.24.

26. On the Petition Date, WebBank, through Libertas Funding, LLC ("WebBank"), held a third priority perfected secured claim against IP in the amount of $613,945.00.

27. Each of FIB, Kompass, and WebBank perfected its security interest in the receivables of IP by a financing statement filed in Wyoming, IP's state of organization, before the date of the Agreement.

28. Each of those perfected interests is senior to any interest in IP's receivables asserted by Core or by any other merchant cash advance funder.

---

[2] Ex. D (California Secretary of State business entity search for Core Funding Source, LLC, entity no. 202118710341); Ex. E (New York Department of State record for Core Funding Source, LLC, DOS ID 7323238).
[3] Ex. G (Proof of Claim No. 145).

29. As of the Petition Date, the accounts receivable of IP had a net value of $8,302,020.73 and the accounts receivable of HFO Logistics, LLC had a net value of $77,404.26, an aggregate of $8,379,424.99, as shown on the accounts receivable aging summaries attached as Ex. F.[4]

30. Because the senior perfected debt exceeds $32 million against receivables worth less than $9 million, every merchant cash advance position, including Core's, is wholly unsecured by value.

**B. The Core Agreement**

31. On March 13, 2026, Core and HI entered into the Agreement, a true and correct copy of which is attached as Ex. A. Hubbard Ingredients LLC is the only merchant named on it, identified as a Missouri limited liability company doing business as Hubbard Ingredients under federal identification number 81-3784763, and Joseph Daniel Hubbard signed for the merchant and as the sole guarantor. Core did not sign the Agreement or the Addendum delivered with it.

32. The Agreement styles itself a purchase and disclaims any borrowing. It provides:

> "Merchant(s) hereby sell, assign, and transfer to CORE (making CORE the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors [...] until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to CORE. [...] The Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and [...] such Purchase Price is not intended to be, nor shall it be construed as a loan from CORE to any Merchant."[5]

[4] Doc. 31 at 2.
[5] Ex. A at 1-2, 5 ("Standard Merchant Cash Advance Agreement"; §§ 1, 14).

33. In spite of the foregoing provision, the Agreement's operation, set out below, is that of a loan.

34. The Agreement recites a purchase price of $1,000,000.00 in exchange for a receivables purchased amount of $1,359,000.00, a premium of $359,000.00 over the amount stated as paid, and states the net funds provided as $970,000.00 after a $30,000.00 origination fee.[6]

35. This premium amounts to approximately thirty-six percent over a term of roughly 210 days, an effective annualized cost of approximately 62 percent.[7]

36. The Agreement states an initial estimated payment of $45,300.00 per week, as an approximation of a specified percentage of 0.72 percent of receivables, which implies a fixed term of thirty weeks. One of the two ACH authorizations delivered with the Agreement authorizes debits of $9,060.00 daily, which is the same $45,300.00 across a five-day week.[8][9]

37. The Agreement provides in Section 4 that any merchant may request a reconciliation at any time, that Core will complete it within two business days of a proper request accompanied by the required documents, and that "[n]othing herein limits the amount of times that a reconciliation may be requested or conducted." A request must be accompanied by all statements

---

[6] Ex. A at 1.

[7] The annualized cost stated above is derived by dividing the $359,000.00 premium by the $1,000,000.00 stated as the purchase price (35.9 percent), and annualizing that figure over the 210-day term implied by the $45,300.00 weekly estimated payment and the $1,359,000.00 receivables purchased amount (35.9% × 365 ÷ 210 ≈ 62 percent). This is a simple, non-compounding calculation and understates the true cost of funds, because the payments begin immediately and reduce the balance from the outset. Measured against the $970,000.00 of net funds the Agreement states were provided, the premium is $389,000.00, or approximately 40.1 percent, and the annualized figure is approximately 70 percent.

[8] Ex. A at 1; *id.* at 20-21 (ACH authorizations).

[9] Dividing the $1,359,000.00 receivables purchased amount by the $45,300.00 weekly estimated payment yields exactly thirty payments, or approximately 210 days. One of the two ACH authorizations delivered with the Agreement authorizes $9,060.00 debited daily, which is $45,300.00 across a five-day week and retires the same amount over the same period. Although the Agreement recites that it "is not a loan and does not have an interest rate," a fixed periodic payment makes the collection period determinate. See Ex. A at 1, 20-21.

covering the period from the date of the Agreement through the date of the request and, if available, the login and password for the merchant's bank account.[10]

38. Core may also change the frequency of the estimated payment between daily and weekly on one day's written notice.

39. The Addendum delivered with the Agreement provides that on any breach of its non-stacking covenants Core "may increase the 'Specified Percentage' under the Agreement from 0.72 % to 1.44 %, effective immediately upon Buyer's delivery of written notice of such breach to Seller, and thus double the periodic payment then applicable at the time of breach."[11]

40. On any event of default the entire balance accelerates. The Agreement provides that "[t]he full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately."[12]

41. The Agreement enumerates four events of default: that a representation to Core proves to have been made intentionally false or misleading in any material respect when made; that the merchant causes an ACH debit to be blocked or stopped without providing advance written notice and an alternative method of collection; that the merchant intentionally prevents Core from collecting any part of the receivables purchased amount; and that the merchant causes an ACH debit to be stopped or returned with a return code of R08, R10, or R29 without explaining why within two business days. A breach of the Addendum's non-stacking covenants is a further default.[13]

[10] Ex. A § 4.
[11] Ex. A, Addendum § 3.1.
[12] Ex. A § 16, Protection 1.
[13] Ex. A § 30; *id*., Addendum §§ 2.1, 3.1.

42. The Agreement recites that a merchant "going bankrupt, going out of business, or experiencing a slowdown in business or a delay in collecting Receivables will not on its own without anything more be considered a breach of this Agreement," and its no-bankruptcy representation is made "as of the date of this Agreement."[14]

43. On default the Agreement further entitles Core to attorney fees "which may include a contingency fee of up to 40% of the amount claimed," and to pre-judgment and post-judgment interest at "24% per annum," in an agreement that recites that it "is not a loan and does not have an interest rate."[15] It also charges a monthly service fee of $299.00 until the receivables purchased amount is delivered in full, a default fee of $5,000.00, and a $195.00 fee for filing a financing statement.[16]

44. The Agreement grants Core a blanket security interest. It provides:

> "To secure each Merchant's performance obligations to CORE under this Agreement and any future agreement with CORE, each Merchant hereby grants to CORE a security interest in collateral (the 'Collateral'), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, as those terms are defined by Article 9 of the Uniform Commercial Code [...]; and (b) all proceeds."[17]

45. The grant of a security interest is made by "each Merchant."[18]

46. Core obtained a guaranty from Joseph Daniel Hubbard, and the Agreement waives the merchant's and guarantor's right to interpose any counterclaim in any litigation or arbitration

---

[14] Ex. A §§ 14, 25.
[15] Ex. A §§ 39, 40.
[16] Ex. A §§ 2(D), (E), (G), 39, 40.
[17] Ex. A § 29.
[18] Ex. A § 29.

Core commences and provides that any claim not asserted against Core within one year after its accrual is time barred.[19]

47. The Agreement and the Addendum are governed by New York law, and the Agreement provides that any litigation must be commenced in a court located in the State of New York.[20]

48. Core advanced funds to HI pursuant to the Agreement, not to IP.

49. No consideration for the receivables Core claims to have purchased moved from Core to IP.

50. The Agreement does not identify specifically any receivables of IP that are being purchased.

51. The Agreement does not specifically identify any receivables at all.

52. Core never examined any specific receivables of IP prior to entering into the Agreement.

53. The Agreement provides that until the receivables purchased amount is received in full, the merchant's receivables "are the property of CORE and not the property of any Merchant," and that each merchant "is a fiduciary for CORE and that each Merchant will hold Receivables in trust for CORE in its capacity as a fiduciary for CORE."

54. The only risk to Core at any point in time was the failure of the merchant and the guarantor to generate sufficient income to repay the receivables purchased amount or to maintain sufficient collateral to do so; this is the same risk that a lender undertakes.

---

[19] Ex. A §§ 37, 38, Guarantee.
[20] Ex. A § 34; *id*., Addendum § 5.1.

55. Core filed a single UCC-1 financing statement, with the Missouri Secretary of State on March 13, 2026, the same day as the Agreement, file number 20260313000327370. That financing statement names Hubbard Ingredients LLC and Hubbard Joseph Daniel as debtors and, on its additional-party pages, names Hubbard Cattle Co., LLC and Integrated Proteins LLC among others. It names Vstate Filings as the Representative, 301 Mill Road Suite U-5, Hewlett, New York, as the secured party of record, and does not name Core. It claims "ACCOUNTS RECEIVABLE, CASH, CASH PROCEEDS, ACCOUNTS, CHATTEL PAPER, EQUIPMENT, GENERAL INTANGIBLES, INVENTORY, INSTRUMENTS RELATED TO THE RECEIPTS, INSTRUMENTS RELATED TO THE FUTURE RECEIVABLES."

56. The Agreement grants Core a security interest only in accounts, deposit accounts, accounts-receivable, other receivables, and proceeds.

57. Core filed no financing statement in Wyoming, IP's state of organization.[21]

58. On August 19, 2026, Core filed proof of claim number 145 in IP's case, asserting $1,041,900.00, stating the whole of it as secured, stating $0.00 as unsecured, giving "UCC Financing Statement" as the basis for perfection, stating the value of the property as $1,041,900.00, and stating the annual interest rate as zero percent, fixed. It leaves blank the line for the amount necessary to cure any default as of the Petition Date. It is signed by Shanna Kaminski as counsel for Core.[22]

59. Claim No. 145 states the basis of the claim as "Breach of Standard Merchant Cash Advance Agreement."

[21] Ex. C (Missouri UCC-1, file no. 20260313000327370, filed March 13, 2026).
[22] Ex. G.

60. Claim No. 145 answers "No" to the question whether the amount claimed includes interest or other charges.

61. Claim No. 145 attaches the financing statement described above and the Agreement package, including the Guarantee, the Bank Information, the Declaration of Ordinary Course of Business, the ACH Authorizations (one for $45,300 per week and one for $9,060 per day), the General Addendum, and the Merchant List Addendum.

62. The amount claimed reconciles to the Agreement. The purchased receipts amount is $1,359,000.00, the weekly delivery amount is $45,300.00, and $1,359,000.00 less seven weekly payments of $45,000.00 is $1,041,900.00.

63. No event of default has occurred, and none is specifically alleged in Claim No. 145.

64. Section 14 provides that a bankruptcy filing "without more" is not a breach.

65. Core has received no payment directly from IP, and IP has never made a payment directly to Core.

### C. The Cash-Collateral Order and Adequate Protection

66. On July 1, 2026, the Court entered the second interim cash-collateral order in the IP case, and on August 5, 2026 the Court entered a third interim order extending its terms (together, the "Interim Order").[23]

67. The Interim Order directs the Debtors to make adequate-protection payments to the Other Lienholders, a group that includes Core, in the amount of $32,429.71 each week, cumulatively.

[23] Second Interim Order Authorizing Interim Use of Cash Collateral and Payment of Adequate Protection, Doc. 243 (July 1, 2026), as extended by the Third Interim Order Authorizing Interim Use of Cash Collateral and Payment of Adequate Protection, Doc. 294 (Aug. 5, 2026).

68. Three of the Other Lienholders appeared and are paid directly, and the Interim Order directs that the remaining balance, $17,205.30 each week, be paid to and held in escrow by First Interstate Bank in a separate interest-bearing account, to be released only on the agreement of the applicable Other Lienholder on a pro rata basis and the Debtors, or on further order of the Court. IP funds that escrow allocation on account of Core's asserted interest in IP's receivables. Core has received no payment.

69. The Interim Order makes no determination of the nature, extent, validity, value, or ownership of any asserted interest.[24]

70. The Interim Order grants replacement liens of the same nature, extent, and validity as existed on the Petition Date, and provides that nothing in it entitles any creditor to improve its position from its position on the Petition Date.[25]

71. The Interim Order reserves the Debtors' and the estate's right to recover adequate-protection payments that cumulatively exceed the actual petition-date value of the recipient's secured interest.[26]

72. Because Core's asserted interest in IP's assets is unsecured by value, no part of the escrowed allocation is payable to it, and every dollar allocated on its account is recoverable.

## V. CLAIMS FOR RELIEF

### Claim 1 — Quiet Title

73. IP realleges the preceding paragraphs.

[24] Doc. 243 at 6, 15-16.
[25] Doc. 243 at 9-11, 13.
[26] Doc. 243 at 14.

74. IP owns the accounts receivable generated by its operations, which are property of the estate under 11 U.S.C. § 541.

75. Core claims to have purchased those receivables under the Agreement.

76. The Agreement is a loan, not a sale.

77. Title to IP's receivables never passed to Core.

78. An actual controversy exists concerning ownership.

79. IP is entitled to and prays for judgment quieting title to its receivables against Core's claims.

**Claim 2 — Declaratory Judgment (Recharacterization)**

**(28 U.S.C. § 2201; Fed. R. Bankr. P. 7001(i))**

80. IP realleges the preceding paragraphs.

81. A true purchase of receivables would require Core to assume a real risk that IP's receipts would decline.

82. In this case, the Agreement provides in both form and substance an absolute right to repayment.

83. The Agreement provides fixed remittances in practice and the reconciliation provision is illusory.

84. The Agreement does not provide for a purchase of specific receivables, but rather a periodic percentage of all receivables, and then provides that payment of the purchased amount is to be made over a finite, calculable term. In other words, the "purchase" did not actually result in possession by the "buyer" of any actual receivable, but only the right to deduct a fixed weekly amount from the merchant's account.

85. The default, guaranty, and security provisions in the Agreement give Core full recourse.

86. The effective annualized cost of the advance under the Agreement is approximately 62 percent, and approximately 70 percent measured against the $970,000.00 of net funds the Agreement states were provided.

87. Based on the foregoing, IP seeks declaratory relief in support of Claim 1 determining that the Agreement constitutes a loan and not a purchase of receivables.

88. An actual controversy exists.

89. IP is entitled to and prays for a declaration under 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001(i) that the Agreement is a loan and not a sale, that any interest of Core in IP's receivables (if any) is a security interest and not ownership, and that title to the receivables remains in IP's estate.

**Claim 3 — Intentionally Omitted**

**Claim 4 — Failure of Contract**

90. IP realleges the preceding paragraphs.

91. Core advanced the purchase price under the Agreement to HI, which the Agreement states as $970,000.00 of net funds provided.

92. No consideration for the receivables Core claims to have purchased moved from Core to IP.

93. A purported sale of IP's receivables without payment to IP fails for want of consideration. No enforceable purchase of IP's receivables was formed, and any purported obligation of IP under the Agreement is unenforceable.

94. IP prays for judgment against Core determining that no enforceable contract exists between Core and IP, barring the release, distribution, or setoff of any part of the escrowed adequate-protection allocation held on account of Core's asserted interest, and disallowing any claim of Core herein.

**Claim 5 — Avoidance of Unperfected Lien**

**(11 U.S.C. §§ 544(a), 551)**

95. IP realleges the preceding paragraphs.

96. A security interest does not attach to collateral unless the debtor has authenticated a security agreement and has rights in the collateral. Even a true buyer of accounts must perfect by filing, and perfection is governed by the law of the debtor's location, which for a registered organization is its state of organization.[27]

97. IP is organized in Wyoming.

98. Core filed no financing statement in Wyoming.

99. Core's only financing statement under the Agreement was filed in Missouri, and it names Vstate Filings as the Representative rather than Core as the secured party of record.

100. The financing statement filed by Core in Missouri names Integrated Proteins LLC as a debtor and claims chattel paper, equipment, general intangibles, and inventory, none of which the Agreement grants to Core and none of which IP granted to anyone.

101. No automatic-perfection exception applies.

102. U.C.C. § 9-309(2) perfects only an assignment that does not transfer a significant part of the assignor's outstanding accounts. The Agreement purports to reach all of each

[27] U.C.C. §§ 9-301(1), 9-307(e).

merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from its customers, without limitation as to account debtor or time period, so § 9-309(2) does not apply. In the alternative, to the extent the Agreement is construed to have assigned accounts outstanding as of its date, it transferred a significant part of them and § 9-309(2) does not apply for that reason as well.

103. The receivables are accounts, rights to payment for goods sold, which the definition of a payment intangible excludes, and recharacterization as a loan independently defeats U.C.C. § 9-309(3), which perfects only a sale.

104. Core's interest in IP's receivables, if any, is therefore unperfected, and IP, as debtor in possession with the rights of a hypothetical judicial lien creditor under § 544(a), may avoid it. The avoided interest is preserved for the estate under § 551.

105. IP prays for judgment against Core avoiding any purported security interest held by Core in and to any assets of IP or its estate.

**Claim 6 — Determination of Secured Status**

**(11 U.S.C. § 506(a))**

106. IP realleges the preceding paragraphs.

107. Pursuant to 11 U.S.C. § 506(a)(1), a secured claim may only be allowed to the extent of the value of the claimholder's interest in the assets of the estate.

108. A claim secured only by collateral whose value is consumed in full by senior liens is not an allowed secured claim under § 506(a).

109. IP's assets, including its receivables, are subject to senior perfected secured claims exceeding $32 million. The receivables are worth less than $9 million.

110. To the extent that Core holds a lien, its lien is not attached to any value in the assets of the estate.

111. To the extent Core holds any allowed claim, it is wholly unsecured under § 506(a), and is allowable, if at all, only as a general unsecured claim.

112. IP prays for judgment determining under 11 U.S.C. § 506(a) that Core holds no secured claim against IP or its estate, and that any allowed claim of Core is a general unsecured claim.

**Claim 7 — Avoidance of Constructively Fraudulent Obligations**

**(11 U.S.C. § 548(a)(1)(B))**

113. IP realleges the preceding paragraphs.

114. Within two years before the Petition Date, IP incurred the obligations to Core described above.

115. To the extent IP incurred any obligation, it was an obligation to deliver $1,359,000.00 while Core advanced the purchase price to HI and nothing to IP.

116. IP received less than reasonably equivalent value in exchange for its obligations under the Agreement.

117. IP was insolvent on the date of the Agreement, or became insolvent as a result, in that its liabilities exceeded the value of its assets and it was not able to pay its obligations as they came due.

118. On the Petition Date IP's liabilities exceeded $121,251,240.98 and the value of all of its property was $36,698,025.67.[28]

[28] Doc. 150 at 128.

119. IP was insolvent on March 13, 2026, when the Agreement was made, in that fifty-four days later its liabilities of more than $121,251,240.98 exceeded the value of all of its property, which was less than $40,000,000.00.

120. IP's liabilities exceeded the value of its assets at all times from and after the date of the Agreement.[29]

121. IP was also unable to pay its bills as they came due at all times from and after the date of the Agreement.[30]

122. IP prays for judgment avoiding the obligations incurred by IP under the Agreement (if any), and disallowing any claim of Core against IP and its estate.

**Claim 8 — Avoidance Under the Kansas Uniform Fraudulent Transfer Act**

**(11 U.S.C. § 544(b); K.S.A. 33-204(a)(2), 33-205(a))**

123. IP realleges the preceding paragraphs.

124. At least one creditor of IP holding an allowable unsecured claim existed on the Petition Date who could avoid the obligations under the Kansas Uniform Fraudulent Transfer Act, K.S.A. 33-201 et seq., as reflected in IP's Schedule F on file herein and the claims that have been filed in IP's chapter 11 case.[31]

125. More than $10,000,000 of the aforementioned claims arose before the obligations under the Agreement were incurred.

---

[29] Doc. 150 at 128; *see* Doc. 150 at 13-14 (the $8,499,614.14 of accounts receivable IP scheduled excludes the intercompany balances reflected in IP's aging, which totals $32,884,680.95 and shows HI at $23,587,587.08). The $8,499,614.14 scheduled figure and the $8,302,020.73 figure alleged above differ by $197,593.41 and are not the same measure: the scheduled figure is IP's alone, while $8,302,020.73 is the net value of IP's accounts receivable on the Petition Date, after related-party balances and doubtful accounts are removed.

[30] Doc. 150 at 128 (priority and nonpriority unsecured claims of $89,119,232.07 outstanding on the Petition Date); Doc. 31 at 5; Claim No. 47-1, Attachment 1 (invoices issued to IP in March 2025 remained unpaid on the Petition Date).

[31] Claim No. 47-1 at 2.

126. IP's accounts receivable were assets within the meaning of K.S.A. 33-201(b), and the obligations IP incurred under the Agreement are obligations within the meaning of K.S.A. 33-204(a) and 33-205(a).

127. Under K.S.A. 33-204(a)(2), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor either was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

128. IP incurred each obligation under the Agreement without receiving a reasonably equivalent value in exchange within the meaning of K.S.A. 33-203(a).

129. At the time of the Agreement, IP was engaged in a business for which its remaining assets were unreasonably small in relation to that business, satisfying K.S.A. 33-204(a)(2)(A).

130. IP's obligations under its twelve merchant cash advance agreements required remittances of not less than $600,000.00 in the aggregate each week.[32]

131. At the time of the Agreement, IP intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due, satisfying K.S.A. 33-204(a)(2)(B).

---

[32] The twelve contractual weekly remittances totaled $607,020.25: Blue Rock $67,500.00, Breeze $18,666.67, Core $45,300.00, EN OD $93,041.66, Harper $67,500.00, Kingdom $25,000.00, Litefund $24,166.67, Merk $45,000.00, NewCo $75,000.00, Novus $45,666.67, Palisades $22,500.00, and Spring $77,678.58.

132. Under K.S.A. 33-205(a), a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

133. IP was insolvent at the time it incurred the obligations under the Agreement, or became insolvent as a result, within the meaning of K.S.A. 33-202(a), in that on the Petition Date its debts of $121,251,240.98 exceeded all of its assets at a fair valuation of $36,698,025.67 and it was generally not paying its debts as they became due.[33]

134. IP, as debtor in possession, may avoid the obligations under 11 U.S.C. § 544(b) to the same extent as the triggering creditor could under the Kansas Uniform Fraudulent Transfer Act.

135. IP prays for judgment avoiding the obligations incurred by IP under the Agreement (if any) under 11 U.S.C. § 544(b) and K.S.A. 33-204(a)(2) and 33-205(a).

**Claim 9 — Objection to Claim No. 145**

**(11 U.S.C. §§ 502(b)(1), 502(b)(9), 1111(a);**

**Fed. R. Bankr. P. 3001(f), 3002(a), 3003(c)(2), (c)(3), 3007(b))**

136. IP realleges the preceding paragraphs.

137. The Court fixed the last day for filing proofs of claim and proofs of interest in these jointly administered cases, and later extended that date to August 15, 2026.

[33] Doc. 150 at 128.

138. The bar date applied to all creditors and parties in interest, including any creditor asserting a claim secured by a lien, security interest, or encumbrance.

139. A creditor must file a proof of claim for its claim to be allowed.

140. IP scheduled Core's claim as disputed. A claim scheduled as disputed is not deemed filed, and Core was therefore required to file a proof of claim for its claim to be treated as a claim in this case.

141. Core filed no proof of claim in IP's case on or before August 15, 2026.

142. Claim No. 145 was filed on August 19, 2026, four days after the bar date.

143. No exception to the late filing is applicable.

144. A creditor that fails to file a proof of claim within the time fixed shall not be treated as a creditor with respect to that claim for the purposes of voting and distribution, and a claim for which proof is not timely filed is disallowed.

145. Claim No. 145 asserts a claim for $1,041,900.00 as fully secured with no unsecured portion, giving "UCC Financing Statement" as the basis for perfection.

146. A claim is not allowable to the extent that it is unenforceable against the debtor and property of the debtor under applicable law.

147. IP received no consideration under the Agreement.

148. The obligations of IP under the Agreement, if any, are avoidable.

149. Claim No. 145 asserts a basis of liability that Core's own documents do not support. The claim rests on breach of the Agreement, but the only breach here arises from the filing of the bankruptcy, which the Agreement expressly disclaims as a breach.

150. Claim No. 145 is not secured. The financing statement on which it rests was filed in Missouri, and IP is organized in Wyoming, so no interest in IP's assets was perfected. No security interest of Core attached to any asset of IP in the first instance.

151. Claim No. 145 is in any event wholly unsecured by value, because IP's receivables are consumed in full by more than $32 million of senior perfected debt.

152. The amount claimed is the purchased receipts amount less seven weekly delivery amounts, and it reconciles exactly.

153. Because Claim No. 145 fails to attach documentation to support its security interest, and because the necessary instrument is neither alleged nor capable of being supplied by the filing of this case, Claim No. 145 is not entitled to be taken as prima facie evidence of the validity and amount of the claim.

154. IP objects to any claim of Core against IP or its Chapter 11 estate and prays for judgment disallowing Claim No. 145 it in its entirety as untimely and unsupported.

**PRAYER FOR RELIEF**

WHEREFORE, IP respectfully requests that the Court enter judgment against Core:

A. Declaring that the Agreement is a loan and not a sale, and quieting title to IP's accounts receivable in its estate;

B. Avoiding Core's unperfected security interest under 11 U.S.C. § 544(a) and preserving it for the estate under § 551;

C. Determining under 11 U.S.C. § 506(a) that Core holds no secured claim and that any allowed claim of Core is a general unsecured claim;

D. Determining that Core gave no consideration to IP and holds no claim against IP and no valid ownership or security interest in IP's receivables;

E. Avoiding the obligations incurred by IP under the Agreement (if any) under 11 U.S.C. § 548 and K.S.A. 33-204(a)(2) and 33-205(a);

F. Disallowing any claim of Core against IP or its estate in its entirety as untimely, no proof of claim having been filed on or before the August 15, 2026 bar date;

G. Barring the release, distribution, or setoff of any part of the adequate-protection allocation held in escrow at First Interstate Bank on account of Core's asserted interest, directing that the allocation be released to IP, and terminating any further allocation on account of that asserted interest;

H. Granting preliminary and permanent injunctive relief under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001(g) restraining Core, and anyone acting in concert with it, from demanding, collecting, applying, or otherwise exerting control over any receivables generated by IP;

I. Awarding costs; and

J. Granting such other relief as is just.

## STATEMENT REGARDING TRIAL

The parties to the Agreement waived trial by jury.[34] Core filed Claim No. 145 in IP's case and thereby submitted to this Court's equitable jurisdiction over the allowance of that claim and over matters that must be resolved to rule on it. The claims against Core are core and are equitable or otherwise triable to the Court. To the extent any jury right exists and has not been waived, IP does not consent to a jury trial before the Bankruptcy Court under 28 U.S.C. § 157(e).

[34] Ex. A § 36.

Respectfully Submitted:

PRELLE ERON & BAILEY, P.A.
*/s/ Michael J. Fowler*
DAVID PRELLE ERON, #23429
JANUARY M. BAILEY, #23926
MICHAEL J. FOWLER, #26394
301 N. Main Street, Suite 2000
Wichita, KS 67202
316-262-5500 / 316-262-5559 (fax)
david@eronlaw.net
january@eronlaw.net
michael@eronlaw.net
***Attorneys for IP Debtors***